## Case No. 5,471.

### GLADSTONE et al. v. CHAMBERLAIN et al.

[4 Int. Rev. Rec. 130.]

Circuit Court, S. D. New York. 1866.

#### PAYMENT IN SPECIE.

Payment of moneys falling due in the United States under a charter executed in a foreign country must be made in specie.

This was an action brought to recover an amount alleged to be due upon a charter. The plaintiffs [Lawrence Gladstone and others] were the owners of the ship John O'Gaunt, which the defendants [William Chamberlain and others], in November, 1862, chartered at Ceylon to bring a cargo to this port for the lump sum of $29,000, which by the terms of the charter was to be paid "in cash upon due delivery of the cargo." On the arrival of the ship gold was at premium and the present controversy arose—the plaintiffs claiming to be paid in gold and the defendants offering payment in legal-tender notes. By an agreement between the parties, the $29,000 in legal tender was paid, and the action was brought to recover the difference. Testimony was given as to what was said between the parties at the time the charter was made, one testifying that it was agreed at the time that "in cash" meant gold or silver, and the other averring that nothing whatever was said about it.

Mr. Lord, for plaintiffs.
Mr. Scudder, for defendants.

SMALLEY, District Judge (charging jury). This is an action brought upon a charter party executed in November, 1862, at the island of Ceylon. It stipulates that the plaintiffs' ship shall receive a cargo of goods to be delivered in the city of New York, for the round sum of $29,000 in cash, to be paid upon delivery. It seems that the goods were received on board of the ship; that they were delivered in the city of New York. When they arrived here, a controversy arose between the consignee of the goods, or rather between one of the parties to this charter, and the plaintiffs as to what this $29,000 should be paid in. Our government had passed a law which the courts have upheld, making it binding and obligatory in this country, that certain paper familiarly called "greenbacks" should be received in discharge of all contracts, and the defendants claimed that they had a right to extinguish their obligation under the charter party by paying these notes, while the plaintiffs claimed that

they were entitled to receive this $29,000 in the great standard of value, gold or silver, which is acknowledged as a standard value throughout the commercial world. The $29,-000 greenbacks was paid under an agreement that the reception of it should not affect the rights of either side; that if under their contract the defendants were bound to pay in what is regarded as the great standard of value, gold or silver, the plaintiffs should still have their claim upon them for the balance, which was stipulated to be fourteen thousand and odd dollars; if on the contrary, the plaintiffs were obliged to receive this $29,000 legal-tender notes, then the obligation was extinguished. You, gentlemen, are to determine what did these parties mean, in the island of Ceylon, at the time they made this charter party—how did they understand this payment was to be made? As I have already intimated, if it was a legal question—one party being a foreigner, and it being made at a foreign port, where gold and silver was the standard of value—I should hold that the presumption of law would be that this must be paid in gold or silver, although it might be made between citizens of the United States, and while in relation to their own matters at home it has been held to the contrary; but for the purposes of this trial the court would charge that between citizens of this country in a foreign country, if they make a contract with reference to greenbacks, with the understanding that it may be paid in that, the law is constitutional and the debt should be so discharged. The plaintiffs in this case are owners of a British vessel; the standard of value in Great Britain and throughout Europe is gold and silver; the contract was made in the port of Ceylon, where the standard of value is gold and silver.

Our government may pass laws which, in regard to our local matters, may make something else the standard of value, but they would not control the commercial world. When you consider that this contract was made in a foreign port, and the goods to be delivered here, the question to be answered by you is, from looking at the contract itself, and from all the evidence in the case, what do you understand the parties meant by the word "cash." If the word "cash" had been used in New York six years ago there would be no doubt about what was meant; you would all say gold and silver; although bills were convertible, yet if they were refused, they were not legal. But after congress made legal-tender notes, it was different. The question, therefore, is how did these parties in a foreign port understand it? Did they mean it should be gold or silver, or in the legal currency of the United States? Did they intend to confine it to the standard currency of the world or to the legal currency of the country? If it was the understanding that it was to be gold or silver, it is the duty of these parties to live up to it and they

ought not to be absolved from it, nor will the court permit them to protect themselves under legal currency of our own. But if, on the other hand, the word "cash" was merely inserted as discriminating between cash and credit; and that they intended it might be performed by the payment of anything that was legal tender here, our currency will be sufficient.

It is very ingeniously argued by counsel for the defendants that the word "cash" is used merely in contradistinction to "credit." If it had been said, "$29,000 payable on delivery," it would have expressed everything without that word. Why that word "cash" was used it is for you to consider and come to a conclusion upon this part of the case.

Then there is some evidence. You have the evidence of Capt. Stanton, who was an agent on the part of the plaintiffs, and who acted as a broker or go-between, and he testified that he understood gold and silver was meant. The defendants read the testimony of Capt. Howe, who acted on their part; and whatever he said at that time binds the defendants. If he understood at that time that it was to be gold or silver, the defendants understood it in the eye of the law; he acted for them. It is argued on the part of the defence that this statement of Howe contradicts the statement of Stanton, while on the other hand, the plaintiff argues that the testimony of Howe is set entirely aside by the testimony of Gladstone, Stanton and others. There is also an affidavit read, taken in Liverpool, to the effects that Howe stated differently from what he states here, and that gold was understood. Now that is not evidence in chief. If they had not made Mr. Howe a witness the court would have excluded it. But the defendants have put him upon the stand; they rely upon his testimony; therefore these declarations of his made upon other occasions, contrary to what he stated in court, are to be received in evidence; not as evidence in chief, but to be considered by you in weighing his evidence.

The case is very simple. Considering the position of the parties, the place where the contract was made, the condition of the country at the time, the testimony of the witnesses and the conversation of the parties, what do you think the parties understood by using this word "cash?" If there had been no local laws of the United States, such as I have referred to, every one would have understood that it meant money; but it is claimed that inasmuch as there was at that time, or very soon after, a legal-tender currency which was not gold or silver here, it would be satisfied by that. If you believe that Capt. Stanton so understood it when he made the contract on the part of the plaintiffs, and that Capt. Howe so understood it when he made the contract on the part of the defendants, you will give a verdict for the defendants. If, on the other hand, at the time the contract was made it was under-

stood between the parties that it was to be gold or silver, you will return a verdict for the plaintiffs for $14,500 with interest from the 18th of April, 1863.

The jury found a verdict in favor of the plaintiffs.

[For subsequent proceedings, see Cases Nos. 5,469 and 5,470.]